**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **HOWARD BOEHM,** | : | **CASE NO. 1:02cv00362** |
| | : | **Beckwith, J.** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **CITY OF PORTSMOUTH, et al.,** | : | |
| | : | |
| **Defendants** | : | |

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Come now Defendants, City of Portsmouth, Ohio, Greg Bauer, Mayor, and Michael Blackburn, Public Service Director, and move this Court for summary judgment in their favor on all claims pursuant to Federal Rule of Civil Procedure 56(b). This motion is based upon the deposition of Plaintiff, the Affidavit of Michael Blackburn, the law of the state of Ohio, federal law, and the United States Constitution, all of which conclusively demonstrate there is no genuine issue of material fact and Defendants are entitled to judgment in their favor as a matter of law.

Respectfully submitted,


    s/ Lawrence E. Barbiere
Lawrence E. Barbiere  (OH #0027106)
Jay D. Patton     (OH #0068188)
Attorneys for Defendants, City of Portsmouth, Greg Bauer, Mayor, and Michael Blackburn, Public Service Director
SCHROEDER, MAUNDRELL, BARBIERE & POWERS
11935 Mason Road, Suite 110
Cincinnati, OH  45249
(513) 583-4200
(513) 583-4203 (fax)
lbarbiere@schroederlaw.com

**M E M O R A N D U M**

## I.     INTRODUCTION

This case arises from a Complaint filed on May 22, 2002 asserting violation of Plaintiff's procedural due process rights under 42 U.S.C. § 1983.  (Compl. at ¶ 1).  Plaintiff was an employee of Defendant City of Portsmouth, Ohio at all relevant times.  The allegations of the Complaint all relate to his transfer from the position of Supervisor of Sanitation to the position of Heavy Equipment Operator by the City on May 22, 2000.  (Compl. at ¶¶ 13-19).  Plaintiff claims Defendants began inquiries into his conduct as Sanitation Supervisor solely in an effort to get rid of him, he was not allowed to be present when witnesses to his conduct were interviewed, he was not given notice that removal was being considered or of the "charges" against him, and he was not given a meaningful opportunity to respond to the findings of the inquiry.  (Compl. at ¶¶ 8-18).  Plaintiff also claims the Heavy Equipment Operator duties he was asked to perform subsequent to the transfer were "demeaning" and caused him embarrassment. (Compl. at ¶ 22).  This Motion is directed to all allegations and causes of action in Plaintiff's Complaint and seeks dismissal of Plaintiff's Complaint with prejudice because there is no genuine issue of material fact and Defendants are entitled to judgment in their favor on all claims as a matter of law.

## II.     STATEMENT OF FACTS

Michael E. Blackburn was Public Service Director for the City of Portsmouth, Ohio, from 1995 to 2003.  (Blackburn Aff. at ¶ 1).  A copy of the Blackburn Affidavit is attached hereto as Exhibit A.  The Sanitation Division, the Grounds Division, and the Streets Division are Divisions within the Public Service Department.  (Blackburn Aff. at ¶ 2).  From August 1996 to May 22, 2000, Howard Boehm was supervisor of the Sanitation Division of the Public Service Department. (Blackburn Aff. at ¶ 3).

1

On May 22, 2000, after a hearing, Howard Boehm was transferred from his position as Sanitation Supervisor to the position of Heavy Equipment Operator in the Streets Division, with no loss in pay. (Blackburn Aff. at ¶ 4). The reasons for removing Plaintiff from the position of Sanitation Supervisor were the disruption of the work force caused by his conduct and his lack of supervisory skills. (Blackburn Aff. at ¶ 5).

The following conduct demonstrates Plaintiff's disruption of the work force and lack of supervisory skills during his tenure as Sanitation Supervisor. (Blackburn Aff. at ¶ 6). In late 1999, one of Plaintiff's employees in the Sanitation Division, Chad Skeans, was placed on light duty by a doctor due to a back injury. (Blackburn Aff. at ¶ 7). In order to comply with the doctor's work restrictions, Plaintiff was directed to have Mr. Skeans work four hours per day in the Sanitation Division picking up garbage, and the remaining four hours per day working for the Grounds Division, which is generally lighter work. (Blackburn Aff. at ¶ 8). Plaintiff was instructed to ensure that Mr. Skeans worked no longer than four hours on the sanitation crew and, if necessary, to drive to Skeans's location and pick him up at the end of the four hours and take him to the grounds crew. (Blackburn Aff. at ¶ 9). Despite repeated instructions, Plaintiff repeatedly failed to ensure Mr. Skeans was taken off the sanitation crew after four hours each day. (Blackburn Aff. at ¶ 10).

In early 2000, Wendy Evans was a Common Laborer[1] in the Sanitation Division. (Blackburn Aff. at ¶ 11). Common Laborers in the Sanitation Division ride on the garbage trucks picking up garbage and placing it in the trucks' load packer. (Blackburn Aff. at ¶ 12). Often, there is an extra Common Laborer on duty in the Sanitation Division who is not needed for making garbage pick-ups on a route. (Blackburn Aff. at ¶ 13). The extra Common Laborer will remain in the sanitation shop

---

[1] Common Laborers are designated as such in the Table of Authorized Employees in the Labor Management Agreement between the City and the AFSCME Union.

with the supervisor performing other duties as assigned. (Id.). The duty of staying in with the supervisor rather than going out on garbage routes is generally preferred by the employees because it is generally easier work. (Blackburn Aff. at ¶ 14).

Prior to Wendy Evans beginning employment with the Sanitation Division, the duty of staying in with the supervisor was rotated evenly among all Common Laborers in the Division. (Blackburn Aff. at ¶ 15). Mr. Blackburn also instructed Plaintiff to evenly divide this responsibility among the Common Laborers in the Division. (Id.).

In early 2000, Plaintiff began giving Wendy Evans preferential treatment by keep her in the shop with him and off the garbage routes almost every day. (Blackburn Aff. at ¶ 16). On March 14, 2000, Ms. Evans complained to Mr. Blackburn that Plaintiff was smothering her by keeping her in with him and not putting her on garbage routes like the other sanitation workers. (Blackburn Aff. at ¶ 17). Ms. Evans stated she wanted to be treated like the other sanitation workers and wanted Plaintiff to leave her alone. (Id.). On March 14 or 15, 2000, Mr. Blackburn counseled Plaintiff to leave Ms. Evans out on a garbage route and rotate her into the shop the same as the other Common Laborers. (Blackburn Aff. at ¶ 18). Plaintiff complied for a few days, but on March 20, 2000, Plaintiff again began showing preferential treatment to Ms. Evans by keeping her off garbage routes with him. (Blackburn Aff. at ¶ 19).

On April 3, 2000, Mr. Blackburn specifically instructed Plaintiff to cease and desist giving Ms. Evans preferential treatment by leaving her in off the garbage routes, and advised him that his actions in giving Ms. Evans preferential treatment were having an adverse effect on the morale and welfare of the personnel in his Division. (Blackburn Aff. at ¶ 20). Mr Blackburn also received complaints from other Common Laborers in the Sanitation Division that Mr. Boehm was showing preferential treatment to Ms. Evans by offering her more overtime than she was entitled to under the

3

Labor Management Agreement. (Blackburn Aff. at ¶ 21). Mr. Blackburn counseled Mr. Boehm to offer overtime opportunities according to the Labor Management Agreement. (Id.). Mr. Boehm complied for a few days, then went back to disproportionately offering overtime to Ms. Evans. (Id.).

On May 8, 2000, Ms. Evans came in to see Mr. Blackburn again. (Blackburn Aff. at ¶ 22). This time she was very distraught and talked about quitting. (Id.). She told Mr. Blackburn Plaintiff made a pass at her, putting his arm around her, telling her he loved her, and trying to kiss her. (Id.). On May 11, 2000, Mr. Blackburn had a face-to-face meeting with Plaintiff and his union representative and explained that there would be a complete investigation into his conduct and that Blackburn intended to suspend Plaintiff for five days during the investigation. (Blackburn Aff. at ¶ 23). Mr. Blackburn explained to Mr. Boehm the reasons for the investigation and suspension, and gave Plaintiff the opportunity to respond and to present his side of the story and any other mitigating information he wished to present. (Id.). At the end of the meeting, Mr. Blackburn provided Plaintiff a letter concerning the investigation and suspension, a copy of which is attached to the Blackburn affidavit as Exhibit 1. (Id.). The May 11, 2000 letter informed Plaintiff the matters being investigated were "very serious" and "required careful consideration." (Blackburn Aff. at Exh 1). The letter also stated that after the investigators' findings were submitted to the Mayor, Mr. Blackburn, and the Union President, "appropriate actions may be taken if needed." (Id.).

Mr. Blackburn and the Mayor appointed Lyn Risby, the Mayor's administrative assistant, and Patricia Williams, a union executive board member, to conduct the investigation into Plaintiff's conduct. (Blackburn Aff. at ¶ 24). On May 19, 2000, Ms. Risby and Ms. Williams submitted their investigative report to the Mayor and Mr. Blackburn and the Union President. (Blackburn Aff. at ¶ 25). A copy of the report is attached as Exhibit 2 to the Blackburn Affidavit. (Id.).

The investigators interviewed Plaintiff, as well as other witnesses to Plaintiff's conduct during the period in question. (Report, p.  ).  The investigators found that Plaintiff "picked on" Chad Skeans and that there were personality clashes between Plaintiff and his employees.  (Report, p.1).

The investigators found that preferential treatment in favor of Ms. Evans did take place and that she was the predominant person to be kept in the shop, off garbage routes.  (Id.).  The investigators found that after Mr Blackburn instructed Plaintiff to put Ms. Evans out on a garbage route, he would do so, but only for a few days at a time, making it necessary for Plaintiff to be given these instructions repeatedly.  (Id.).

Notably, the investigators specifically found that Plaintiff lacked supervisory skills, noting his argumentative nature with employees, his inability to settle disputes with workers before referring the problem to Mr. Blackburn, and his trying to be friends with his workers to the detriment of his supervisory authority.  (Report, p. 2).

The investigators found the relationship between Ms. Evans and Plaintiff began as a genuine friendship, but that the situation began to change approximately a month before the report was issued.  (Report, p. 3).  The investigators also found that Plaintiff tried to hold Ms. Evans's hand at least twice,  asked her for a hug and a kiss at least once, and told Ms. Evans he loved her.  (Id.).  Even after Ms. Evans told him not to do so, Plaintiff told her he loved her and Ms. Evans told him again not to say it.  (Report, p. 3-4).  The investigators found Ms. Evans was made to feel uncomfortable in Plaintiff's presence.  (Report, p. 3).  The investigators found that Plaintiff helped Ms. Evans financially, asking nothing in return, and on one occasion, gave Ms. Evans a carton of cigarettes and when Ms. Evans asked Plaintiff how much she owed him, he said that she could give him a hug for them sometime.  (Report, p. 4).  Ms. Evans told the investigators she felt "smothered" by Plaintiff and that he frequently made her come away from other workers or conversations to be

with him. (Id.). Although Ms. Evans told the investigators she did not believe she had been sexually harassed, the investigators found she spoke to Mr. Blackburn in part to "ensure that a friendship did not become anything more." (Report, p. 4-5).

Although the investigators found that sexual harassment was not intended, they did find that Plaintiff lacked supervisory skills and that his inappropriate conduct had been a disruption to the work force. (Report, p. 1-2). At the time the investigators' report was submitted, Mr. Boehm's Union Representative, Roy Payton, was given notice of the time, place, and location of a hearing, which would take place on May 22, 2000 concerning Mr. Boehm's future employment status. (Blackburn Aff. at ¶ 25)

On May 22, 2000, a hearing was held in which Plaintiff, Mr. Blackburn, Mayor Bauer, the investigators, and Plaintiff's Union Representative, Roy Payton, were present. (Blackburn Aff. at ¶ 26). At the hearing, the findings of the investigation were explained to Plaintiff and he was given an opportunity to respond to the findings of the investigation and to present his side of the story and any other mitigating information he wished to present. (Blackburn Aff. at ¶ 27). Plaintiff was not restricted in the duration or content of his presentation at the hearing, and was given the opportunity to ask questions of Mr. Blackburn, the Mayor, the Union President, and the investigators. (Blackburn Aff. at ¶ 28). As a result of the findings of the investigators and all of the information presented at the hearing, the Mayor and Mr. Blackburn decided to remove Plaintiff from the position of Sanitation Supervisor and place him the position of Heavy Equipment Operator, with no loss in pay. (Blackburn Aff. at ¶ 29). This decision was based upon the disruption to the work force in the Sanitation Division caused by Plaintiff's actions, Plaintiff's lack of supervisory skills, and his inability to properly supervise the Sanitation Department. (Blackburn Aff. at ¶ 30). Mr. Blackburn

provided Plaintiff a letter, a copy of which is attached as Exhibit 3 to the Blackburn Affidavit, notifying him of, and explaining the reasons for, his removal. (Blackburn Aff. at ¶ 31).

Heavy Equipment Operators, in accordance with their job description, are sometimes required to perform tasks which do not involve the operation of heavy equipment. (Blackburn Aff. at ¶ 32). A true and accurate copy of the job description is attached to the Blackburn Affidavit as Exhibit 5. (Id.). Under the Labor Management Agreement, job task assignment is a management privilege and is not affected by seniority. (Id.). In the Public Service Department, non-heavy equipment assignments were rotated evenly among all Heavy Equipment Operators in the Division unless one or more employees had documented medical restrictions preventing them from performing certain tasks. (Id.). Upon Plaintiff's reassignment to the position of Heavy Equipment Operator, he was assigned to various specific job tasks on the same basis and in the same manner and frequency as other Heavy Equipment Operators in the streets division. (Blackburn Aff. at ¶ 33). Only when Mr. Boehm complained that, for some reason or another, he could not perform a given task, was he taken out of the regular rotation. (Id.).

A copy of relevant portions of the Labor Management Agreement between the American Federation of State, County and Municipal Employees, Local Union 1039 and the City of Portsmouth, Ohio governing the period May 1, 2000 through April 30, 2003 is attached to the Blackburn Affidavit as Exhibit 4. (Blackburn Aff. at ¶ 34). The Union Agreement provides a four-step grievance procedure, culminating in binding arbitration, which provides redress for employees who believe they have been wrongly disciplined. (CBA, Article 10, Grievance Procedure, pp. 15-18).

III.    **ARGUMENT OF LAW**

A.    **PLAINTIFF RECEIVED ALL PROCESS WHICH WAS DUE**

The evidence of record establishes Plaintiff received due process. Under Ohio law, an Ohio Civil Service Employee such as Plaintiff may have a property right in continued employment. *DeMarco v. Cuyahoga Co. Dept. of Human Svcs.*, 12 F.Supp.2d 715 (1998). State law defines the contours of such property rights. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1984). If Plaintiff has such a property right, his employer must offer him a hearing prior to termination. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-42, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

The "essential" principle behind procedural due process is that deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.* at 542, 105 S.Ct. 1487 (*quoting*, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). The *Loudermill* Court emphasized this principle requires "some kind of a hearing" before the discharge of an employee who has a constitutionally protected property interest in his employment. *Id.* The hearing need not be elaborate, or even a full evidentiary hearing:

> The hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions — essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action . . . . The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

Id. at 545-46, 105 S.Ct. 1487 (internal citations omitted).

In *Loudermill*, the Supreme Court did not require a full adjudicatory hearing before a state acts to impair a state property interest. The Sixth Circuit described this in *Duchesne v. Williams*, 849 F.2d 1004 (6th Cir.1988) (*en banc*), *cert. denied*, 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989). In fact, the Sixth Circuit found that a pre-termination hearing resembles the procedures required of public schools before disciplining students. *Id.* at 1007 (citations omitted). In the present case, Plaintiff was clearly afforded such a hearing prior to his removal from the Sanitation Supervisor position. Because Plaintiff received a hearing, the only issue is whether the hearing comported with due process.

In *DeMarco*, *supra*, the plaintiff claimed the defendant denied him procedural due process because his notice of the grounds for the discipline differed from the grounds ultimately found. The Court found that while the Due Process Clause required a pre-deprivation hearing in some situations, there is no constitutional right to predeprivation notice of the grounds used to support discipline. The *DeMarco* court stated:

> DeMarco argues the pre-termination hearing cannot be meaningful if the plaintiff addresses charges different from those used to support his discharge. But as to being able to participate in the pre-termination hearing, the complaint does not say DeMarco was unable to present his side of the story. *Loudermill* requires nothing more to satisfy procedural due process in the pre-deprivation phase.

*DeMarco* at 720.

The pre-termination hearing must give the employee the "chance to clarify . . . misunderstandings or to convince the employer that termination is unwarranted." *Powell v. Mikulecky*, 891 F.2d 1454, 1458 (10th Cir.1989). "Nothing in *Loudermill* suggests that a public employee is entitled to some type of 'pre-notification notice' of the charges against her or him." *Id.*

at 1459.   In *Powell*, the court held that a brief face-to-face conversation was adequate notice of charges supporting the subsequent firing.   *Id.*

In *Collyer v. Darling*, 98 F.3d 211 (6th Cir.1996), *cert. denied*, 520 U.S. 1267, 117 S.Ct. 2439, 138 L.Ed.2d 199 (1997), the Sixth Circuit described the notice required before the pre-discipline hearing.   In *Collyer*, a state agency gave notice to an employee before discipline.   The notice was a letter stating a doctor had determined the employee was not fit for service because of a mental condition.   However, with this notice, the state did not give a copy of the doctor's report. *Id.* at 224.   The Sixth Circuit held that the state institution had provided the employee sufficient notice for his suspension.  The Court denied the procedural due process claim on the further ground that the employee had adequate postdeprivation remedies available.  Id.

The *Collyer* Court explained:

> Collyer claims the pre-deprivation process here was inadequate because the BDC did not give him sufficient notice of its intended action and because he was denied a copy of Dr. Lingl's report.   First, although the BDC may not have followed the exact process contained in the collective bargaining agreement, Darling's August 4, 1988, letter followed by the formal notice gave Collyer sufficient advance notice of the intended disciplinary action and the hearing.   As regards Dr. Lingl's report, Loudermill and its progeny do not require any more than adequate explanation of the reasons for the employer's action. Thus, it was sufficient for the BDC to inform Collyer that he was being "suspended" because the doctor determined him unfit due to a mental condition.

*Collyer v. Darling*, 98 F.3d at 224.

Other decisions are in accord.  *See*, *Riggins v. Bd. of Regents of the Univ. of Nebraska*, 790 F.2d 707 (8th Cir.1986) (1 ½ hour meeting with division manager was adequate pre-termination notice because employee knew meeting was to be about insubordination incident even though she did not know meeting also would cover her prior work history); *Brasslett v. Cota*, 761 F.2d 827 (1st

Cir.1985) (fire chief's meeting with town manager adequate notice of termination at conclusion of meeting); *Kelly v. Smith*, 764 F.2d 1412 (11th Cir.1985) (face-to-face meeting sufficient notice and opportunity to respond to satisfy pre-termination due process), *overruled in part on other grounds*, *McKinney v. Pate*, 20 F.3d 1550 (11th Cir.1994), cert. denied, 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995).

Courts have not fashioned stringent standards covering pre-termination hearings because more formal post-termination hearings may remedy any deficiencies in the pre-termination phase and satisfy due process. *West v. Grand County*, 967 F.2d 362, 367 (10th Cir.1992).   In the present case, even if there was some defect in the pre-discipline hearing process, which is denied, Plaintiff had post-deprivation review protection, including binding arbitration, under the grievance procedures of the Labor Management Agreement, remedies which Plaintiff attempted unsuccessfully to exploit. *See, Collyer*, 98 F.3d at 224 (even if pre-deprivation process inadequate, an adequate post-deprivation remedy satisfies procedural due process); *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir.1991) (if the facts are such that pre-deprivation remedies are impossible, then the inquiry is limited to post-deprivation remedies provided by the state, and the burden is on the plaintiff to demonstrate the inadequacy of the remedies).

To state a claim for violation of procedural due process, the plaintiff bears the burden of pleading and proving the state remedies for redressing the alleged wrong are inadequate. *Collyer*, 98 F.3d at 223; *Vicory v. Walton*, 721 F.2d 1062, 1066 (6th Cir.1983), cert. denied, 469 U.S. 834, 105 S.Ct. 125, 83 L.Ed.2d 67 (1984).   In the present case, Plaintiff does not allege in his complaint that his state post-deprivation remedies, or the remedies provided under the CBA, were inadequate. *Loudermill* held Ohio's post-termination administrative procedures for discharged public employees were adequate. *Loudermill*, 470 U.S. at 547-48, 105 S.Ct. 1487.   *See also*, *Parfitt v. Columbus*

*Correctional Facility*, 62 Ohio St.2d 434, 437, 406 N.E.2d 528 (1980) (Ohio Rev. Code § 124.34 provides adequate procedural safeguards to classified employees), cert. denied, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980).

Consequently, there is no genuine issue of material fact, Plaintiff received all process which was due, and Defendants are entitled to judgment in their favor as a matter of law.

### B.    SUBSTANTIVE DUE PROCESS

Plaintiff's complaint also makes nebulous reference to what could be construed as a substantive due process claim. Plaintiff claims Defendants dismissed him in an malicious manner implicating his life, liberty, and property interests.   (Compl. at ¶¶ 23-24, 27-28).  Plaintiff asserts the defendants targeted him for investigation because they wanted him out and ruined his reputation.

Public employees, however, do not enjoy a substantive due process right in public employment. *DeMarco*, *supra*, at 721 (*citing*, *Sutton v. Cleveland Bd. of Educ.*, 958 F.2d 1339, 1351 (6th Cir.1992)). In *Sutton*, the Sixth Circuit stated:

> Although *Baesler* did not conclude that all state-created contract rights lack substantive due process protection, and specifically left unanswered the question whether substantive due process may protect a contract right to keep a tenured job, we are persuaded by the reasoning of *Baesler* that plaintiffs' statutory right to be discharged only for cause is not a fundamental interest protected by substantive due process.

*Id.* at 1351 (citations omitted).

Substantive due process protects "specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir.1988).  Procedural due process, and not substantive due process, protects most state-created contract rights.  *Charles v. Baesler*, 910 F.2d 1349, 1353 (6th Cir.1990).  Substantive due process "affords only those protections 'so rooted in the traditions and conscience

12

of our people as to be ranked as fundamental.' . . . it protects those interests, some yet to be enumerated, 'implicit in the concept of ordered liberty,' like personal choice in matters of marriage and the family." *Id.* (citations omitted).

The Sixth Circuit has been skeptical about raising state-created employment rights to the level of such fundamental interests protected by substantive due process. *Id.* at 1353-54. In manifesting this hesitancy, the Sixth Circuit cited former Justice Powell's position that "[e]ven if one assumes the existence of a property right, however, not every such right is entitled to the protection of substantive due process. While property interests are protected by procedural due process even though the interest in derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution." *Id.* at 1354 (*quoting*, *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 229, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (Powell, J., concurring) (other citations omitted)). Further, the Sixth Circuit has cautioned against applying the "shocks the conscience" standard for cases not involving physical abuse or excessive force. *Cassady v. Tackett*, 938 F.2d 693, 698 (6th Cir.1991). Accordingly, to the extent Plaintiff's Complaint articulates a cause of action for violation of substantive due process, there is no genuine issue of material fact and such claim must be dismissed as a matter of law.

## C.   PLAINTIFF HAS FAILED TO ESTABLISH THE POST-DISCIPLINE REMEDY OF MANDAMUS WAS INADEQUATE

Plaintiff has failed to present any evidence the post-discipline remedy of mandamus was inadequate, thereby barring his claims. The Court in *Ryman v. Reichert*, 604 F.Supp. 467 (S.D. Ohio 1985) held that:

> . . . a Plaintiff in a 1983 action who alleges deprivation of property without due process has the burden of pleading and proving that State remedies are inadequate to redress the alleged wrong . . . . In the present case, plaintiff has failed to demonstrate that the post-

13

abolishment remedy of mandamus was inadequate. Mandamus would afford plaintiff reinstatement and back-pay.

*Ryman* at 472 (citing, *Campbell v. Shearer*, 732 F.2d 531 (6th Cir.1984); *Vicory v. Walton*, 721 F.2d 1062 (6th Cir. 1983)). As a result, there is no genuine issue of material fact and Defendants are entitled to summary judgment in their favor as a matter of law.

### D.    PLAINTIFF CANNOT CLAIM DEPRIVATION OF CONSTITUTIONAL RIGHTS BASED UPON HIS ASSIGNED JOB TASKS *VIS A VIS* OTHER WORKERS

Plaintiff claims Defendants violated his due process rights in assigning him to the position of Heavy Equipment Operator, because the duties involved in that position were "demeaning" to a person of his standing. This assertion does not give rise to a justiciable cause of action under Section 1983.

The burden is upon the plaintiff to establish violation of a clearly established constitutional right. *Buckner v. Kilgore*, 36 F.3d 536 (6th Cir. 1994). In establishing a violation of equal protection, the plaintiff in a Section 1983 action must prove that the defendant acted in an intentionally discriminatory manner. *F.D.I.C. v. Henderson*, 940 F.2d 465 (9th Cir. 1991). Plaintiff has not made such a showing. The basis of his allegations concerning job assignments is that he felt the tasks he was asked to perform were demeaning and he was embarrassed to do such work. (Compl. at ¶22). What Plaintiff is asserting is that there is a constitutional difference between operating heavy equipment and non-heavy equipment tasks such as cleaning streets and picking up leaves. Defendant submits that differential job tasks, unless they directly impact upon pay or job rating, do not raise a constitutional issue. The job description for Heavy Equipment Operator clearly states an Heavy Equipment Operator must also perform the tasks of a Light Equipment Operator, a Utility Person, and a Common Laborer as the situation dictates. (Blackburn Aff., Exh. 5, p. 1).

14

Title VII, 42 U.S.C. §2000e, cases provide a standard that can be applied equally to section 1983 cases since we are referencing the same 14th Amendment rights, albeit under a different statutory basis. The Eighth Circuit in *Ledergerben v. Stangler*, 122 F.3d 1142 (8th Cir. 1997) held that a transfer involving only minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action necessary to establish a prima facie case of discrimination under Title VII. In *Boone v. Goldin*, 178 F.3d 253 (4th Cir. 1999), the Court held that Title VII was not intended to provide redress for trivial discomforts endemic to employment. *Williams v. Bristol-Myers Squibb*, 85 F.3d 270 (7th Cir. 1996), an ADEA case, followed the same reasoning.

Ridicule or stigma to reputation alone, absent accompanying deprivation of employment is not a liberty interest protected by the 14th Amendment. *Versarge v. Township of Clinton New Jersey*, 984 F.2d 1359 (3rd Cir. 1993); *See also, Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1996). Where a loss is not only small but also indefinite so that substantial resources would have to be devoted to determining whether there was any loss at all, courts will invoke the doctrine of "*de minimus non curat lex*" and dismiss the case even if it raises constitutional issues, where the cost of such litigation would overwhelm the benefits. *Hessel v. O'Hearn*, 977 F.2d 299 (7th Cir. 1992). Such is precisely the case here with respect to Plaintiff's allegations concerning the tasks he was assigned to perform.

The court in *Swick v. City of Chicago*, 11 F.3d 85 (7th Cir. 1993) presented a police officer who was put on involuntary sick leave and had his badge and other accouterments of office taken away. The court observed:

> The constitutionalization of public employment is controversial even
> when limited to protecting the economic dimensions of employment.

> It should not be extended beyond harms having measurable economic value . . . .

*Id*. at 87.  In considering officer Swick's situation the court discussed precisely the issues involved here with respect to task assignments..

> Even if the harassments could be interpreted as a breach of an explicit or implicit employment contract, as the "suspension" of officer Swick might be interpreted as a breach of a term made part of his employment contract by the statute, they do not in themselves count as deprivations of property.  Otherwise we shall be hearing appeals next in cases in which the public employer reneged on a promise to give the employee an office with a view, or a second secretary, or leave to coach a little league team.

*Id*. at 88.

Further, the cross-utilization of Heavy Equipment Operators is clearly permitted in the Labor Management Agreement as a management right, and is clearly provided for in the job description for Heavy Equipment Operator.  The cross-utilization was done for a valid business purpose; thus giving no constitutional basis for liability. *Jones v. ITT Educ. Services, Inc.*, 587 F.Supp 1533 (E.D. Wyo. 1984).

It is also well established that injury to reputation alone is not a protected liberty interest. *Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Paul v. Davis*, 424 U.S. 693, 708, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).  A person may have a protected liberty interest in his reputation, good name, honor and integrity, as well as being free to move about, live and practice his profession without the burden of an unjustified label of infamy. *Joelson v. United States*, 86 F.3d 1413 (6th Cir.1996). However, to establish a deprivation of a protected liberty interest in the employment context, the plaintiff must show a stigmatizing governmental action which so negatively affects his reputation that it effectively forecloses the opportunity to practice a chosen profession. *Id*. at 1420.  Liberty interests are not implicated by allegations of improper or inadequate

16

performance or charges of incompetency, neglect of duty or malfeasance, and a charge that merely makes a plaintiff less attractive to other employers but leaves open a definite range of opportunity does not constitute a liberty deprivation. *Id.* In *Siegert*, 500 U.S. at 234, 111 S.Ct. 1789, the Supreme Court held that plaintiff's allegations that alleged defamation by the defendants resulted in an impairment of future employment opportunities was not sufficient to assert an injury of constitutional magnitude, and that any injury caused by defendants to plaintiff's reputation did not constitute a claim under the constitution.

As a result, Plaintiff was not deprived of constitutional rights by Defendants asking him to perform work other than operating heavy equipment, just as other Heavy Equipment Operators were asked to perform.

### E. DEFENDANTS BAUER AND BLACKBURN WERE SUED IN THEIR OFFICIAL CAPACITIES ONLY AND HAVE NO INDIVIDUAL LIABILITY FOR PLAINTIFF'S CLAIMS

In the caption of the Complaint, the second named Defendant is "Greg Bauer, Mayor" and the third named defendant is "Michael Blackburn, Public Service Director." There is no allegation in the Complaint that Defendants Bauer and Blackburn are liable for the §1983 claims in their individual capacities. In *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 61, 109 S.Ct. 2304, 2307, 105 L.Ed.2d 45 (1989), the Supreme Court held that a suit against a state employee in his official capacity was a suit against the office, not the individual, and therefore was no different than a suit against the state itself. Further, such officials were not "persons" under 42 U.S.C. §1983 and therefore could not be held liable for money damages. In *Wells v. Brown*, 891 F. 2d 591, 592 (6th Cir. 1989), the Court held that the Supreme Court's decision in *Will* "required Plaintiffs seeking damages under §1983 to set forth clearly in their pleading that they are suing state officials as individuals, rather than as officials." In this case, Defendants Bauer and Blackburn are named in the

caption of the case only in their official capacities as Mayor and Public Service Director. There is nothing within the Complaint to notify Defendants Bauer or Blackburn of the potential for individual liability. It is clear that the claims against Defendants Bauer and Blackburn based on §1983 are in their official capacities only and that, therefore, all claims under §1983 against Defendants Bauer and Blackburn should be dismissed as a matter of law.

## F.    DEFENDANTS BAUER AND BLACKBURN ARE ENTITLED TO QUALIFIED IMMUNITY

In the event this Court finds Defendants Bauer and Blackburn were acting sued in their individual capacities, the evidence establishes they were within the scope of their discretionary duties as to all the actions which are the subject of this litigation and therefore are entitled to qualified immunity. It is well established that:

> Government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed. 2d 396 (1982); *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed. 2d 523 (1987). Thus, for government officials, "qualified immunity represents the norm." *Harlow, supra*, 457 U.S. at 807, 102 S.Ct. at 2732. Moreover, qualified immunity is a question of law to be decided by the Court. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed. 2d 411 (1985); *Harlow, supra*, at 411.

In analyzing the qualified immunity defense, the Court must first determine whether Plaintiff has shown a violation of a constitutionally or statutorily protected right and second whether the right is so "clearly established" that a "reasonable official would understand that what he is doing violates that right." *Brennan v. Township of Northville*, 78 F.3d 1152 (6th Cir. 1996), *citing Anderson v.*

*Creighton*, 483 U.S. 635, 640, 97 L.Ed. 2d 523, 107 Sup. Ct. 3034 (1987); and *Meginty v. Stenger*, 27 F.3d 1120, 1124 (6th Cir. 1994). The test for resolving qualified immunity depends on the objective reasonableness of the official actions. *Rich v. City of Mayfield Heights*, 955 F.2d 1092 at 1094 (*citing Anderson*, at 639, 107 S.Ct. at 3038). Once qualified immunity is properly asserted, the burden shifts to the plaintiff to present the Court with specific facts demonstrating a violation of clearly established law. *Mitchell v. Forsyth*, 472 U.S. 511, at 526, 105 S.Ct. 2806 at 2815, 86 L.Ed. 2d 411 (1985).

Whether a right is "clearly established" is to be determined by looking to specific facts in reference to the particular actions of the defendant official based on pre-existing law of the United States Supreme Court and the Sixth Circuit. *Anderson* at 3039; *Guercio v. Brody*, 911 F.2d 1179, (6th Cir. 1990) at 1184-1185. Thus, for qualified immunity purposes the right to have been violated:

> . . . must have been "clearly established" in a more particularized, and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Anderson*, at 640, 107 S.Ct. at 3039 (citations omitted; emphasis added).

As noted by the Sixth Circuit in *Rich v. City of Mayfield Heights*, 955 F.2d 1092 (6th Cir. 1992):

> The ultimate burden of proof is on the plaintiff to show that the defendants are not entitled to qualified immunity. Defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority during the incident in question. Thereafter, the burden shifts to the plaintiff to establish that the defendants' conduct violated rights so clearly established that any official in defendants' positions would have clearly understood that they were under an affirmative duty to refrain from such conduct.

*Id*, at 1095.

In this case, Plaintiff cannot satisfy the initial burden of proving a constitutional violation as set forth above in Sections A-E.  Further, plaintiff cannot produce any evidence that any of the defendants violated clearly established law.  As a result, Defendants Bauer and Blackburn are entitled to summary judgment based upon qualified immunity.

### G.    THE CITY IS NOT LIABLE FOR PUNITIVE DAMAGES

Plaintiff has also made a claim in his Complaint for exemplary damages.  Ohio law and federal law are both clear that no such claim can be made against a municipality.  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 69 L.Ed.2d 616, 101 S.Ct. 2748 (1981).  As a result, Plaintiffs' claims for punitive damages must be dismissed as a matter of law.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, there being no genuine issue of material fact remaining for trial on any claim and Defendants being entitled to judgment in their favor as a matter of law, Defendants City of Portsmouth, Ohio; Gregory Bauer, Mayor; and Michael Blackburn, Public Service Director, respectfully ask this Court to GRANT summary judgment in their favor and to DISMISS all of Plaintiff's claims herein with prejudice and at Plaintiff's cost.

Respectfully submitted,

   s/ Lawrence E. Barbiere
Lawrence E. Barbiere  (OH #0027106)
Jay D. Patton    (OH #0068188)
Attorneys for Defendants, City of Portsmouth, Greg Bauer, Mayor, and Michael Blackburn, Public Service Director
SCHROEDER, MAUNDRELL, BARBIERE & POWERS
11935 Mason Road, Suite 110
Cincinnati, OH  45249
(513) 583-4200
(513) 583-4203 (fax)
lbarbiere@schroederlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2003, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, and I hereby certify that I have mailed by United States

Postal Service the document to the following non-CM/ECF participants:

William K. Shaw, Jr.
***Attorney for Plaintiff***
1306 Offnere Street
Portsmouth, OH   45662.


    s/ Lawrence E. Barbiere
Lawrence E. Barbiere  (OH #0027106)
Jay D. Patton    (OH #0068188)
Attorneys for Defendants, City of Portsmouth, Greg
Bauer, Mayor, and Michael Blackburn, Public
Service Director
SCHROEDER, MAUNDRELL, BARBIERE & POWERS
11935 Mason Road, Suite 110
Cincinnati, OH  45249
(513) 583-4200
(513) 583-4203 (fax)
lbarbiere@schroederlaw.com