**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **HOWARD BOEHM,** | : | **CASE NO. C-1-02-0362** |
| | : | **(J. Beckwith)** |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **CITY OF PORTSMOUTH, et al.,** | : | |
| | : | |
| **Defendants** | : | |

---

### AFFIDAVIT OF MICHAEL E. BLACKBURN

---

Comes now Affiant, Michael E. Blackburn, in his capacity as former Public Service Director

for the city of Portsmouth, Ohio, and after being duly cautioned and sworn, deposes and states as

follows:

1.      I was Public Service Director for the City of Portsmouth, Ohio, from 1995 to 2003 and

have personal knowledge of the information set forth below.

2.      The Sanitation Division, the Grounds Division, and the Streets Division are, and were

at all times relevant to this case, Divisions within the Public Service Department.

3.      From August 1996 to May 22, 2000, Howard Boehm was supervisor of the Sanitation

Division of the Public Service Department.

4.      On May 22, 2000, after a hearing, Howard Boehm was transferred from his position

as Sanitation Supervisor to the position of Heavy Equipment Operator in the Streets Division, with

no loss in pay.

5.      The reasons for removing Mr. Boehm from the position of Sanitation Supervisor were

the disruption of the work force caused by his conduct and his lack of supervisory skills.

EXHIBIT A

6.    Mr. Boehm's disruption of the work force and lack of supervisory skills were manifested by the activities and conduct set forth below in paragraphs 7 through 22.

7.    In late 1999, one of Mr. Boehm's employees in the Sanitation Division, Chad Skeans, was placed on light duty by a doctor due to a back injury.

8.    In order to comply with the doctor's work restrictions, Mr. Boehm was directed to have Mr. Skeans work four hours per day in the Sanitation Division picking up garbage, and the remaining four hours per day working for the Grounds Division, which is generally lighter work.

9.    Mr. Boehm was instructed to ensure that Mr. Skeans worked no longer than four hours on the sanitation crew and, if necessary, to drive to Skeans's location and pick him up at the end of the four hours and take him to the grounds crew.

10.    Despite repeated instructions, Mr. Boehm repeatedly failed to ensure Mr. Skeans was taken off the sanitation crew after four hours each day.

11.    In early 2000, Wendy Evans was one of approximately eight Common Laborers[1] in the Sanitation Division.

12.    Heavy Equipment Operators in the Sanitation Division generally drive the garbage trucks on garbage routes and Common Laborers in the Sanitation Division ride on the garbage trucks picking up garbage and placing it in the trucks' load packer.

13.    Often, there is an extra Common Laborer on duty in the Sanitation Division who is not needed for making garbage pick-ups on a route. The extra Common Laborer will remain in the sanitation shop with the supervisor performing other duties as assigned.

---

[1]Common Laborers are designated as such in the Table of Authorized Employees in the Labor Management Agreement between the City and the AFSCME Union.

14.    The duty of staying in with the supervisor rather than going out on garbage routes is generally preferred by the employees because it is usually easier work.

15.    Prior to Wendy Evans beginning employment with the Sanitation Division, the duty of staying in with the supervisor was rotated evenly among all Common Laborers in the Division. In addition, I instructed Mr. Boehm to evenly divide this responsibility among the Common Laborers in the Division.

16.    In early 2000, Mr. Boehm began giving Wendy Evans preferential treatment by keeping her off the garbage routes and in the shop with him almost every day.

17.    On March 14, 2000, Ms. Evans came to me and complained that Mr. Boehm was smothering her by keeping her in with him and not putting her on garbage routes like the other Common Laborers in the Sanitation Division. Ms. Evans stated she wanted to be treated like the other Common Laborers and wanted Mr. Boehm to leave her alone.

18.    On March 14 or 15, 2000, I explained to Mr. Boehm that he needed to leave Ms. Evans out on a garbage route the same as other Sanitation Division workers. As usual, he complied for a few days.

19.    On March 20, 2000, Mr. Boehm again began showing preferential treatment to Ms. Evans by keeping her off garbage routes and in the shop with him.

20.    On April 3, 2000, I specifically instructed Mr. Boehm to cease and desist giving Ms. Evans preferential treatment by leaving her in off the garbage routes, and advised him that his conduct in giving Ms. Evans preferential treatment was having an adverse effect on the morale and welfare of the personnel in his Division.

21.    I received complaints from other Common Laborers in the Sanitation Division that Mr. Boehm was also showing preferential treatment to Ms. Evans by offering her more overtime than

she was entitled to under the Labor Management Agreement. I counseled Mr. Boehm to offer overtime opportunities according to the Labor Management Agreement. Mr. Boehm complied for a few days, then went back to disproportionately offering overtime to Ms. Evans.

22.     On May 8, 2000, Ms. Evans came in to see me again. This time she was very distraught and talked about quitting. She told me Mr. Boehm made a pass at her, putting his arm around her, telling her he loved her, and trying to kiss her.

23.     On May 11, 2000, I had a face-to-face meeting with Mr. Boehm and his union representative at which I explained to Mr. Boehm that there would be an investigation into his conduct and that I intended to suspend him for five days during the investigation. I explained to Mr. Boehm the reasons for the investigation and suspension. During this meeting, Mr. Boehm had the opportunity to respond and to present his side of the story and any other mitigating information he wished to present. I then provided Mr. Boehm a letter concerning the investigation, a true and accurate copy of which is attached hereto as Exhibit 1.

24.     I appointed Lyn Risby, the Mayor's administrative assistant, and Patricia Williams, a union executive board member, to conduct the investigation.

25.     On May 19, 2000, the investigators submitted a report to myself, the Mayor and Plaintiff's Union Representative, Roy Payton. A true and accurate copy of the report is attached hereto as Exhibit 2. Mr. Boehm's Union Representative, Roy Payton, was given notice of the time, place, and location of the hearing, which would take place on May 22, 2000, at this time.

26.     On May 22, 2000, the hearing was held. Mr. Boehm, myself, Mayor Bauer, the investigators, and Roy Payton were present.

27.     At the hearing, the findings of the investigation were explained to Mr. Boehm and he was given an opportunity to respond to the findings of the investigation and to present his side of the story and any other mitigating information he wished to present.

28.     Mr. Boehm was not restricted in the duration or content of his presentation at the hearing, and was given the opportunity to ask questions of myself, the Mayor, the Union President, and the investigators.

29.     As a result of the findings of the investigators and all of the information presented at the hearing, the Mayor and I decided to remove Mr. Boehm from the position of Sanitation Supervisor and place him in the position of Heavy Equipment Operator, with no loss in pay.

30.     This decision was based upon the disruption to the work force in the Sanitation Division caused by Mr. Boehm's actions, Mr. Boehm's lack of supervisory skills, and his inability to properly supervise the Sanitation Department.

31.     Attached hereto as Exhibit 3 is a true and accurate copy of the letter from me to Mr. Boehm notifying him of his removal and reassignment. The letter also advised Mr. Boehm of his right to redress under the Labor Management Agreement.

32.     Heavy Equipment Operators, in accordance with their job description, a true and accurate copy of which is attached hereto as Exhibit 5, are sometimes required to perform tasks which do not involve the operation of heavy equipment. Under the Labor Management Agreement, job task assignment is not dependent upon seniority. In the Public Service Department, non-heavy equipment assignments were rotated evenly among all Heavy Equipment Operators in the Division unless one or more employees had documented medical restrictions preventing them from performing certain tasks.

33.     Upon Mr. Boehm's reassignment to the position of Heavy Equipment Operator, he was assigned to various specific job tasks on the same basis and in the same manner and frequency as other Heavy Equipment Operators in the Streets Division. Only when Mr. Boehm complained

that, for some reason or another, he could not perform a given task, was he taken out of the regular rotation.

34.    Attached hereto as Exhibit 4 is a true and accurate copy of Articles 3, 10, 11, 13, and 26 of the Labor Management Agreement between the American Federation of State, County and Municipal Employees, Local Union 1039 and the City of Portsmouth, Ohio governing the period May 1, 2000 through April 30, 2003.

FURTHER AFFIANT SAYETH NAUGHT.

Michael E. Blackburn
Former Public Service Director
City of Portsmouth, Ohio

Sworn to and subscribed by Michael E. Blackburn in my presence this ___ day of October, 2003.

Notary Public

ANGIE CHAMBERLIN
Notary Public, State of Ohio
My Commission Expires
February 27, 2008



**CITY OF PORTSMOUTH**
**PUBLIC SERVICE DEPARTMENT**

MICHAEL E. BLACKBURN
PUBLIC SERVICE DIRECTOR

55 MARY ANN STREET
PORTSMOUTH, OHIO 45662

TELEPHONE: 740/354-7766
FAX: 740/353-3459

May 11, 2000

From:  Public Service Director
To:    Howard Boehm
Info:  Roy Payton, Jr., President, AFSCME Local 1039

Subj:  Suspension

In accordance with the Labor Management Agreement, Article 11, you are hereby suspended for a period of five days with pay effective May 15, 2000. This action is taken in order to complete an investigation into the following allegations:

- Since your suspension of November 15, 1999 you continue to disrupt the workforce i.e. our many discussions about Chad Skeans' light duty.
- You were instructed on or about April 3, 2000 to cease and assist from your preferential treatment of Wendy Evans and to "Leave her alone".
- Your actions have had an adverse effect upon the moral and welfare of the personnel put in your charge.
- I received a complaint on 8 May, 2000 that you have exhibited inappropriate behavior towards one of your laborers, Wendy Evans. She states that you have made unwarranted advances towards her despite her requests for you to stop.

The allegations above are very serious and require careful consideration, hence the five-day suspension with pay, this will give us time to conduct a through investigation into these charges. During the five days you will insure that you are available to the person or persons conducting the investigation to answer any and all questions. Furthermore, you will make no contact with any personnel involved or who may be involved with this investigation.

At the conclusion of this investigation the finding will be submitted to the myself, the President of AFSCME 1039, and the Mayor in order that appropriate actions may be taken if needed. Be advised that in accordance with Article 11, Section 1, you may be represented by the Union President or Union Steward, and/or a Ohio Council 8 Union Representative and you have the right to redress as the Labor Management Agreement permits.

Sincerely,

M E BLACKBURN
Public Service Director

**EXHIBIT**

1



CONFIDENTIAL

**TO**:        Honorable Mayor Greg Bauer
**FROM**:   Lyn Risby, Patricia Williams
**RE**:        Howard Boehm
**DATE**:   May 19, 2000


The following is the results of the investigation of the complaints against Howard Boehm, Supervisor, Sanitation Department, as per the attached letter. Lyn Risby, Mayor's Admin Assistant and Patricia Williams AFSCME Executive Board member conducted this investigation during the week of May 15 – 19, 2000.

## ITEM ONE: HARRASSMENT OF CHAD SKEANS

To the complaint of Chad Skeans being harassed, we find no substance. It is fair to say he has been "picked on", but no more than any other employee under Mr. Boehm's supervision. There is clear and sufficient evidence to show there is a problem with personality clashes between Mr. Boehm and his employees. It would appear, although Mr. Boehm has been told to pick Chad Skeans up at 11:30 a.m., he has also been told "four hours is four hours" and THAT is the expression he has heard and to which he has adhered. The instances when Chad Skeans was picked up late would seem to be genuine. Even another supervisor has said he has been unable to pick Mr. Skeans up on time. Mr. Boehm seems to have let the worker's know when he was running late and often attempted to make alternate arrangements. It may well be that Mr. Boehm was late because he did not organize himself efficiently, but that is another matter.

## ITEM TWO: PUTTING WENDY EVANS ON A ROUTE AND "LEAVING HER ALONE"

To the complaint of putting Wendy Evans on a route and leaving her there, we find that Mr. Boehm did indeed put Ms. Evans out on a garbage route when he was told to do so by Mr. Blackburn. However, he did not leave her there for more than a few days at a time. This necessitated Mr. Boehm being given these instructions repeatedly. Mr. Boehm felt, when he did not put Ms.Evans out on a route, that he needed a driver for the dumpsters or he needed for her to fill-in in some other capacity. It was also discovered that other employees on the garbage routes were rotated so it would make sense that occassionally Ms. Evans did not go out on the routes.

We feel the initial problem arose from the fact that Ms. Evans coworkers were constantly complaining to the Service Director about preferential treatment toward Ms. Evans. We feel there is disruption of the workplace caused by these complaints and certainly, Mr. Boehm has contributed to it by keeping Ms. Evans off the trucks. However, a large portion of the blame must be laid at the door of her coworkers and their "shop talk". There is substantial jealously because Ms. Evans has a CDL license and they do not. We



tabbies

EXHIBIT

2

want to note here that all employees are afforded the same opportunity to acquire their CDL licenses.

Also contributing to the disruption of the workplace, it would appear that management did not tell employees who made complaints of preferential treatment that the matter had been addressed, so they assumed nothing had been done. This lack of communication spilled over into such areas as perceived preferential treatment, by management, concerning tardiness and other matters. When we speak of management we do not necessarily mean the Service Director only, this also applies greatly to his assistant. This is an easily addressed issue, but will need the involvement of the whole sanitation department to be made aware that they are causing their own disruption.

Not so easily addressed is the lack of supervisory skills possessed by Mr. Boehm. His argumentative nature with the employees and inability to settle disputes with his workers before running to Mr. Blackburn garners him no respect. He would like to be everyone's friend, which is impossible when one is in charge of others. He, as well as other supervisors, feels that supervisors do not always have the backing of management. This also contributes to the lack of respect between supervisors and their employees. Of course, management cannot always back supervisor's decisions if they are felt to be incorrect. It may well be worth looking into the idea of mandatory attendance at supervisory seminars for anyone promoted to the position of supervisor.

## ITEM THREE: PREFERENTIAL TREATMENT

The consensus among the workforce is that preferential treatment does take place. Mr. Boehm states his reasons for keeping Wendy Evans off routes are simple. If there are enough people to cover all the garbage routes then her possession of a CDL license makes her the logical person to keep at hand. If a driver is needed for any reason, she is ready and available to replace the driver without causing any disruption to any of the routes. He also states that if he sends her out on the dumpsters he can rely on her to do as she is asked and to work diligently. He does keep other men off the routes, but it is fair to say Wendy Evans is the predominant person. Again, we have to state that jealousy comes into play because she possesses a CDL license so she has more opportunity for acting pay etc., while men with more seniority, and no CDL license, do not. We were repeatedly told that men think Mr. Boehm uses the allocation of job routes as a punishment. When asked, Mr. Boehm stated that recently changes have been made and although in the past some routes were harder than others, they are now all fairly equal. He also stated that the talk of being put on a route as a punishment started as a joke. We tend to believe this is the case and we bear in mind that someone has to go out to cover every route. It would seem to the uninitiated that the distribution of job assignments is not terribly efficient. This area could perhaps be looked at. Several employees have spoken to Mr. Blackburn about preferential treatment so even if it were not the case, it would appear to be a problem and must be addressed.

## ITEM FOUR: SEXUAL HARASSMENT

Before remarking on the complaint of sexual harassment, we would like to state the definition:

Unwelcome sexual advances, requests for sexual favors, and/or other verbal or physcal conduct of a sexual nature towards a person when:

- It is made clear that the person must submit to this conduct as a condition or a part of employment.
- Submitting or rejecting the conduct is used to make employment decisions about the person.
- The conduct interferes with (or is intended to interfere with) the person's work performance or creates an intimidating, hostile, or offensive work environment.

Ms. Evans states that Mr. Boehm has tried to hold her hand a couple of times and asked her for a hug and a kiss. She states that she would not actually call it sexual harassment, but she is made to feel uncomfortable in his presence. According to the terms above, that would qualify as sexual harassment. However, we think there are several factors that need to be taken into account.

Ms. Evans states that she and Mr. Boehm have a friendship and that she has always been aware that he is fond of her. Mr. Boehm agrees and says he feels for her like a daughter. Ms. Evans has not minded this at all; indeed at times, she has found him a great comfort and helpful friend. She did not consider anything amiss in their relationship until her coworkers started making complaints about preferential treatment, calling her "Howard's girl" and other disparaging remarks relating to their friendship. This has made her very uncomfortable. In itself, this is a form of harassment caused by her fellow workers. I do not think she has ever told any of her coworkers that it makes her feel uncomfortable, nor has she asked them to stop. It does make an intimidating work environment for her however.

Ms. Evans has freely stated that Mr Boehm gave her a hug before she went into hospital for surgery and that he has comforted her at times when she has been crying because of the pressures of her situation at home. She has not objected to any of these overtures as she felt that they were of the kind given one friend to another. She does feel, however, that in the past month the situation has begun to change. Mr Boehm has told her that he loves her, which is a common phrase bandied about by the workers when at the transfer station. Ms. Evans told Mr. Boehm not to say that to her. When he asked why she told him it was different, because he was her boss. On another instance, Mr. Boehm said, "I love you". She again told him not to say it. When he asked why he must not say it, as others do, she said that there is a difference between saying, "Love ya" and "I love you". Since that time Mr. Boehm has not said it again. When asked why he told her he loved her the second time after being told not to the first time he states that he thought it was a

,oke and that as others at the transfer station say it, it was okay for him to. Since the second occurance, it has not happened again.

Ms. Evans states Mr. Boehm gave her a carton of cigarettes and when asked how much he was owed, he said that she could give him a hug for them sometime, but this has never happened and Mr. Boehm has not tried to force himself upon her in any sexual way. Nor has he ever made comments that would imply that the conditions of her job depend upon her treatment of him. It would appear that pats on the back, an arm around the shoulder and the odd hug do take place amongst the workforce, but are not considered to be of a sexual nature and Ms. Evans has never taken offense from anyone doing so. We believe that Mr. Boehm's remarks about the hug for the cigarettes were truly meant as a casual, jokey remark and did not intend it to have any other meaning.

Given the nature of their friendship it would appear that Mr. Boehm is protective and looks out for Ms. Evans. He has helped her out financially when the need has arisen and neither asked nor expected anything in return. Both parties have stated this. He has phoned her at home in the mornings when she did not have an alarm clock at Ms. Evans request. When she had troubles with her car, she went for help to Mr. Boehm.

Lately, Ms. Evans has felt that she is being "smothered" by Mr. Boehm and that he is always making her come away from other workers or conversations to be with him. When her coworkers were questioned about this, almost all agreed that Mr. Boehm did indeed call her away to come with him, but that it was during the working hours and was to get on with the job and not hang about chatting.

Ms. Evans states that she went to Mr. Blackburn and told him of the instances mentioned above because she felt that there was beginning to be a change in the relationship between herself and Mr. Boehm and that she did not know how to handle it. She thougt that if she were put out on a garbage route so that there was less contact between herself and Mr. Boehm, it would help the matter.

Looking at all the facts and taking into account the comments made by other employees that Mr. Boehm has lent money to several people when they are in need and that he would do anything to help someone we feel that those were his intentions towards Ms. Evans. The "I love you's" and request for a hug seem to be for him on the same casual footing with her as the rest of the workers. We feel that he has perhaps become too protective and possessive of Ms. Evans, but that it has not been done with any sexual implications in mind.

Referring to the definition of sexual harassment, the fact that Ms. Evans has been made to feel uncomfortable around Mr. Boehm would lead one to the conclusion that harassment has taken place. However, one must remember that Ms. Evans states that she does NOT feel that Mr. Boehm has sexually harassed her, he has instead made her feel uncomfortable, especially for his proprietal air (which was not of a sexual nature) in front of others. In addition, we must take into account her reason for speaking of this matter to

Mr. Blackburn. She states it was not to make a complaint against Mr. Boehm. She hoped to stop other workers complaining about her preferential treatment and making remarks to her about Mr. Boehm and to ensure that a friendship did not become anything more.

Therefore, we feel that no sexual harassment was intended. One would have to say that Mr. Boehm has shown a lack of good judgment and that Ms. Evans did not appreciate that others could misconstrue her dependance upon Mr. Boehm.

cc:    Mike Blackburn, Director Service Dept.
       Roy Payton Jr., President AFSCME Local 1039



**MICHAEL E. BLACKBURN**
PUBLIC SERVICE DIRECTOR

**CITY OF PORTSMOUTH**
**PUBLIC SERVICE DEPARTMENT**

55 MARY ANN STREET
PORTSMOUTH, OHIO 45662

TELEPHONE: 740/354-7766
FAX: 740/353-3459

May 11, 2000

From: Public Service Director
To: Howard Boehm
Info: Roy Payton, Jr., President, AFSCME Local 1039

Subj. Suspension

In accordance with the Labor Management Agreement, Article 11, you are hereby suspended for a period of five days with pay effective May 15, 2000. This action is taken in order to complete an investigation into the following allegations:

- Since your suspension of November 15, 1999 you continue to disrupt the workforce i.e. our many discussions about Chad Skeans' light duty.
- You were instructed on or about April 3, 2000 to cease and assist from your preferential treatment of Wendy Evans and to "Leave her alone".
- Your actions have had an adverse effect upon the moral and welfare of the personnel put in your charge.
- I received a complaint on 8 May, 2000 that you have exhibited inappropriate behavior towards one of your laborers, Wendy Evans. She states that you have made unwarranted advances towards her despite her requests for you to stop.

The allegations above are very serious and require careful consideration, hence the five-day suspension with pay, this will give us time to conduct a through investigation into these charges. During the five days you will insure that you are available to the person or persons conducting the investigation to answer any and all questions. Furthermore, you will make no contact with any personnel involved or who may be involved with this investigation.

At the conclusion of this investigation the finding will be submitted to the myself, the President of AFSCME 1039, and the Mayor in order that appropriate actions may be taken if needed. Be advised that in accordance with Article 11, Section 1, you may be represented by the Union President or Union Steward, and/or a Ohio Council 8 Union Representative and you have the right to redress as the Labor Management Agreement permits.

Sincerely,

M. E. BLACKBURN
Public Service Director

Monday May 15. Lyn Risby and Trish Williams with Mike Blackburn

LR: According to letter there are a couple of problems that need to be looked into in your department. Disruption of work force by Howard Boehm regarding Chad Skeans and his light duty. If you could give us some background on that.

MB: Mr. Skeans has been on light duty since before first of the year. In the last couple of months he has worked four hours for sanitation and four hours grounds crew. As directed by doctor. Myself, and my assistant, Jeff Spencer, have repeatedly told Mr. Boehm four hours is four hours; he has to come off the truck. Every time we turn around he is trying to direct him to stay longer or one way or another keep him on that truck for more than four hours. We try to explain to him that it is directed by the doctor, we cannot change that. It is the treatment, he has to do it.

LR: Have you seen him or heard him make remarks to Chad?

MB: Yes. Most recent one was he called him on radio and told him that he needed to be, it was only an hour or half an hour, I can't remember but he needed him to stay on the route while he went and got his relief. He had specifically been instructed on how to have the truck go through the cemetery or he pick up the person from the cemetery take him to the route, take Skeans back to the cemetery.

LR: When you say you have repeatedly spoken to him about it can you be more specific?

MB: Probably about the 16th of March was when I started talking to him. Since then it has been four or five times, the latest one being May 11th when I issued this letter. Also, Mr. Spencer has talked to him. He started on about the 20th of March same instance, the work schedule, deviate from the schedule of four and four.

LR: Has Skeans come and spoken to you about xxx

MB: No, he has not. Skeans just wants to, he has talked to me about it one time since the middle of March. He just wants Howard to abide by the four hours and four hours so he can get his treatment done and get back to a full work schedule. That's what I have tried to explain to Mr. Boehm.

LR: So he tells Chad, he asks Chad to stay over longer. Does he harass him about it, make fun of him?

MB: Personally, I haven't heard him be abusive or bantering with him about these four hours. He has come to me and said he feels that Skeans is working the system, if you will and is xxx injury. I have tried to explain to him that he has lower lumber strain, or a lumbar sprain and he is injured, he was injured on the job and this is the reasonable accommodation we are making.

TW: The doctor he is going to, is this through the work well program?

1

MB: Yes

TW: Was Howard told that at a specific time you take it through the cemetery or go pick him up no later than this time to accommodate that you will have the other four hours covered?

MB: Yes. He's been told that on numerous occasions.

TW; And that's why he has just not followed that procedure

MB: He has not followed those instructions. It last for a week or ten days and then it will slide.

LR: I'm going to move on to the next thing on here. We may want to come back to this later. According to this letter MR. Boehm was instructed on April 3 to cease and desist from his preferential treatment of Wendy Evans and to "leave her alone" and that his actions have had adverse effect upon the morale and welfare of the personnel. Also, on May 8 he exhibited inappropriate behavior towards Wendy Evans by making unwarranted advances. Start at the beginning, what was the reason he was told to leave her alone on April 3 and what was his preferential treatment, please?

MB: He's, on about April 3, he was not putting her, she is a common laborer and he would not leave her out on a route. He would keep her in to either a. work on the fourth truck, which picks up dumpsters or special pickups or he'd leave her to go ride the truck with him to go to do his other duties.

LR: Is it normal for him to have someone accompany him on his truck?

MB: It's normal if there is the extra person and if there is a need. If he is going out to pick up a couch or something heavy that needs assistance. The problem is that it was always her going with him. It was not being spread out. She is not the senior laborer, I know, seniority does not dictate job assignments but I've instructed Howard in the past to switch it around between everyone assigned to the division.

LR: So if he needs someone he will just call up a truck and say send me so and so I need them to come and help me Pick up a dumpster?

MB: No, he keeps them in all day long. It's not that he goes out and gets somebody, on occasion he does, or he'll switch somebody out to go out and get them. But with her a lot of times he'll just leave her in. I've talked to him about it and his reasoning is well, she does a better job than everybody else. I can trust her to do the job. She knows what I want so she can get the job done. We'll tell him put her on a route and leave her there. That will last for awhile and then she'll come off the route for one reason or another, whether she has to drive for one of the other trucks or not, also I've said something to him about the overtime that has been awarded. She is one of the junior people in the

2

division and she has the second most overtime. Howard has the most overtime in the division, she has the second most.

LR: Do you not, or are you not supposed to start from the bottom of the list of overtime to get the people so they all have a good rotation of it, or at least offer it to them?

MB: Yes

LR: Is this not happening?

MB: No, it's not. I tried to have the supervisors, if they are going to assign overtime it's the supervisors responsibility to make sure that they have a list, they know who has the least amount of overtime and who has the most. It is up to the supervisor to fill the voids as needed.

LR: To your knowledge is he trying to offer it to other people and they're turning it down, or is he not offering?

MB: In a few instances he has offered it, but for the most part no, it is not being offered.

TW: Have you received any complaints from the other employees of not equal distribution of overtime?

MB: Yes, from drivers and laborers alike.

TW: In the sanitation department?

MB: Yes, that's when I talked to Howard about making sure you go by the list; make sure you have equal distribution of the overtime.

TW: His reasoning for giving Wendy all the overtime?

MB: Well, she was working on that truck. She was doing that during the day, I just left her out and let her finish the job, just a variety of reasons.

LR: And when he calls her off the truck, and she stays in all day to do it, which then covers her route? Have you enough people to cover?

MB: There is an extra person that usually goes with the fourth garbage truck that picks up the dumpsters as well as any special pickups. He'll keep her off that truck and the guy driving that truck works that route by himself, or sometimes there are two people, so that there's one with them one with Howard and he does special pickups and she's with him.

LR: Has Wendy herself ever made any comments about this particular .

MB: The overtime?

3

LR: The over time and the preferential treatment?

MB: Acting pay, no, no that's something that I'd say two thirds of the division have talked to me about and I've looked into over the past month of the overtime and acting pay she is drawing. She has not, you don't look a gift horse in the mouth, I understand I'm not going to hear it from her, but I have heard it from her coworkers and Mr. Spencer, who does the payroll has brought it to my attention.

LR: Moving on from there, ON May 8th Wendy Evans came to you saying Howard Boehm made improper advances?

MB: That's the second time she's come to me. The first time was back in March, I have written down on or about the 14th of March and she complained that he was, for lack of a better word, smothering her. He was always right there. Wouldn't put her out on the routes, was always keeping her in, the same things I've touched on previously. I told, I asked her at that time he is making any unwarranted or unwanted advances and she said she didn't' want to get Howard into any trouble but she wanted to be treated like everyone else. She felt that she wasn't being treated, she wanted to be put out on a route's he wanted to be able to do her job and she wanted to be left alone.

LR: So she did come and speak to you about preferential treatment she was getting?

MB: OK, yes. But she didn't, she wasn't complaining that she was getting overtime or she was complaining that she wasn't being put on the trucks to run a route. If there were enough people Howard was always keeping her in.

TW: Which one was more money? Being put out on a route or riding around with Howard?

MB: They both pay the same. And it's a lot easier work riding around with Howard.

TW: When you say putting her out on a route was that driving or being on the back slinging garbage?

MB: Being on the back, throwing garbage. Being treated just like all the other laborers. Now, whenever we do have a driver off she is the senior, she's the next senior person to be in line to drive and we have a driver off probably once a week. We have four heavy equipment operators and I'd say at least one of them is off sometime during the week, generally speaking. So she does get to drive a route.

LR: Roughly, the 14th of March or so she came in and spoke to you about the preferential treatment and the feeling of being smothered?

MB: Right. I asked if he was, I don't know whether I used the word harassing her, but she said she want to make any problems for Howard, he is her boss and she has to work

there and the whole nine yards. I told her that I'd say something to him, assign her to a route leave her there only if she needs to drive which I did the 14th or 15th. I spoke to MR. Boehm, Mr. Spencer was present and explained to him exactly what needed to be done. He said he understood, I got the normal answer whenever I talk to him about it, about she does the best job, the same things I touched on earlier.

TW: Did he leave her on the route after that?

MB: For a while.

TW: How long?

MB: UH, well it was approximately six days, because he had MR Spencer had, I was off on the 20th of March and Jeff had to tell him to put her on the route.

TW: On this incident here, the April 3rd incident to cease and desist preferential treatment, who was there when you told him to leave her alone?

MB: Nobody, just me and him

LR: Was this April 3rd meeting because after six days, by March 20th he was back showing preferential treatment?

MB: Yes, and I told him he had to quit, he had to leave the girl alone, he had to leave her alone, let her do her job, do his job and just stop. He said he wasn't doing anything that he would leave her on the route.

TW: On this unwarranted advances she did tell you what kind of advances? Did he touch her in an inappropriate way? What were the advances?

MB: She

LR: This is the next time she came into you?

MB: Yes, this was on May 8th

TW: Excuse me, yes May 8th

MB: On May 8th when she came in she was very distraught, she came in to talk to me about quitting. Apparently she had called and talked to Roy Payton or somebody else, she called and talked to them. They suggested she come in and see me. So she came in to ask me about quitting or a leave of absence, she's having other personal problems, marital problems in her life and that was conflicting. She ahs been written up in the past for being late and she was having problems with that. At the same time she brought up the thing with Howard, which she said he had made a pass at her, he was putting his arm around her, he told her that he loved her, tried to kiss her.

5

LR: And what did she do?

MB: Told him no, stop.

TW: Did he continue did she say?

MB: He, I think the instances she was referring to me were at different times. It wasn't all on the same day. She had some surgery done, it's been a month ago maybe, and I think during that time frame is when it started from. She didn't give me dates but I think in that time frame is when it started.

TW: During that time was she still coming in to work after she had ....?

MB: She was only off for three or four days and then she was back into work.

LR: Did she tell MR. Boehm, when he put his arm around that it was unwelcome, or did she wait until he tried to kiss her?

MB: She didn't say. She did say she just told him no.

TW: But she didn't elaborate whether he stopped after she told him?

MB: Right

LR: She came in and told you this on May 8, did anything happen after that? AT the moment we're assuming that she told Howard no when he tried to kiss her.

MB: Right

LR: What has transpired since?

MB: ON... as in what transpired since. I gave Howard this letter on the 11th. I tried to talk to the president of the union, Roy Payton, that day and he was off. He was off the next day. The following day we had labor negotiations. I told Wendy to stay on a truck, that I would get with Roy. She said all I want is for this to stop so I can feel good about doing my job. I said okay, I'll tell Howard to leave you on a truck, to leave you alone, which generally worked for a few days, which in this case it did. Until I could get with Roy Payton, get this letter done. He went on vacation on May 11th as soon as I gave him this letter he applied for vacation for the rest of this Thursday, Friday and then he was suspended for five days during this proceedings this week.

TW: Has Howard and Wendy been separated. Howard is not at work?

MB: Howard came to work; he came back to work Thursday afternoon after he left on vacation. He came to work Friday morning, he came in this morning. He said he had to

talk to me. I told him I couldn't talk to him. As far as I know he has not talked to Wendy. I know he has talked to Roy Payton, he's talked to Tommy Bradley, Howard Hayslip or Ralph Hayslip, Larry Mitchell I don't know what he's talked about but he has come in and talked to a variety of people. I told him this morning when he came in to go home and only talk to you all whenever you called. That is outlined in this letter also. Wendy stopped me this morning, well actually I stopped her because Howard said, one of the things he said this morning was that Wendy was running all over town telling everybody and I told her this morning don't' talk about this to anybody. She said she's not but people are stopping her and asking her about it. As far as I know there were four copies of this letter I had one, you all have one, Howard has one, and there's one, Roy Payton so Wendy says she's not talking to anybody. She's also said that Howard has not said anything to her.

TW: So since then they have been separated?

MB: Yes

LR: But you do not know if the I love you and the attempt of a kiss and the putting the arm around her, if they happened at one time or separate times. You do not know when she told him not to do this, or if he has since done anything since she told him?

MB: NO. As far as I know, since the, I guess it was the 8th of May when he made a pass at her and she told him no. I assume it was on the 8th of May when that happened.

LR: So we don't know what his behavior towards her has been like since she told him no

MB: Right. Since she's come to talk to me I have tried to keep them apart.

TW: Was Howard on the incident of April 3rd when you talked to him about leaving her alone, did he seem to understand that he was showing preferential treatment and it would not be tolerated. Howard seemed to understand what you said to him? He had a clear understanding?

MB: I think so. I think he had, I mean leave her alone is leave her alone

TW: HE had a clear understanding leave her on the route, spoke to you about this numerous times, since March 15th.

LR: At this point when you said leave her alone this was just to do with preferential treatment you had no indication of any more personal treatment

MB: No

TW: Sexual Harassment

MB: Right, No type of treatment.

7

TW: Since Howard has received this letter has anyone come to you, I mean you have seen him talking but has any employee come to you and said Howard's talking to me about sexual harassment case.

MB: No. I've had a few come to me and ask what is going on with Howard. But that's it. My response has been he's on vacation.

LR: Anything else you would like to add at this point?

MB: Can't think of anything.

LR: Thank you, we may need to speak to you later after we have spoken to some others.



MICHAEL E. BLACKBURN
PUBLIC SERVICE DIRECTOR

CITY OF PORTSMOUTH
PUBLIC SERVICE DEPARTMENT

55 MARY ANN STREET
PORTSMOUTH, OHIO 45662

TELEPHONE: 740/354-7766
FAX. 740/353-3459

May 22, 2000

From:  Public Service Director
To.    Howard Boehm
Info:  Roy Payton, Jr., President, AFSCME Local 1039

Subj   Removal from Position

In accordance with the Labor Management Agreement, Article 3, you are hereby removed from the position of Supervisor, Sanitation Division, effective this date based upon the following:

1.  Your actions have caused disruption within the workforce in the Sanitation Division of this Department.
2.  Lack of supervisory skills and inability to properly supervise the Sanitation Division.

The above actions are unsatisfactory.  You are hereby assigned temporarily to the Street Maintenance Division as a Heavy Equipment Operator with no loss of wages.  The position of Supervisor, Sanitation Division, will be posted and filled per the Labor Management Agreement, Article 15.  The subsequent vacancies will be available for you to sign for and be awarded.  Let me reiterate that this action will not result in any loss of wages.

Furthermore, be advised that if you desire to be considered for a future supervisory position that may become available within the city you must enroll in basic supervisory classes and successfully complete said classes.  If you are interested in these classes please notify myself or my assistant for information.  Also be advised that you have the right to redress as the Labor Management Agreement permits.

Sincerely,

M. E. BLACKBURN
Public Service Director

EXHIBIT

3

AGREEMENT BETWEEN

# THE AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES LOCAL UNION 1039

AND

# THE CITY OF PORTSMOUTH, OHIO

MAY 1, 2000 THROUGH APRIL 30, 2003



EXHIBIT

4

# TABLE OF CONTENTS

| | | |
|---|---|---:|
| PREAMBLE | | 01 |
| Article 01: | INTENT AND PURPOSE | 02 |
| Article 02: | RECOGNITION | 03 |
| Article 03: | MANAGEMENT RIGHTS | 04 |
| Article 04: | NONDISCRIMINATION | 05 |
| Article 05: | DUES DEDUCTION | 06 |
| Article 06: | UNION REPRESENTATION | 09 |
| Article 07: | PROBATIONARY PERIOD | 11 |
| Article 08: | ESTABLISHMENT OF NEW POSITIONS | 13 |
| Article 09: | PRODUCTIVITY | 14 |
| Article 10: | GRIEVANCE PROCEDURE | 15 |
| Article 11: | DISCIPLINE | 19 |
| Article 12: | NO STRIKES/NO LOCKOUT | 21 |
| Article 13: | SENIORITY | 22 |
| Article 14: | TEMPORARY ASSIGNMENTS | 25 |
| Article 15: | JOB POSTING AND PROMOTIONS | 26 |
| Article 16: | LAYOFF AND RECALL | 28 |
| Article 17: | LEAVES OF ABSENCE | 30 |
| Article 18: | SICK LEAVE | 35 |
| Article 19: | HOURS OF WORK | 36 |
| Article 20: | FRINGES AND COMPENSATION | 39 |
| Article 21: | RETIREMENT BENEFITS | 41 |
| Article 22: | CLOTHING ALLOWANCE | 42 |
| Article 23: | HOSPITALIZATION | 44 |
| Article 24: | VACATIONS | 45 |
| Article 25: | HOLIDAYS | 48 |
| Article 26: | CIVIL SERVICE RIGHT WAIVER | 50 |
| Article 27: | LICENSE/CERTIFICATION PAY | 51 |
| Article 28: | INTEGRITY OF AGREEMENT | 53 |
| Article 29: | CONTRACT REPRODUCTION | 54 |
| Article 30: | CONTRACTING OUT | 55 |
| Article 31: | RESIDENCY | 56 |
| Article 32: | HEALTH AND SAFETY | 57 |
| Article 33: | COMMERCIAL DRIVERS LICENSE | 58 |
| Article 34: | AFSCME CARE/LEGAL PLAN | 60 |
| Article 35: | PAY CHECKS/PAY DAYS | 61 |
| Article 36: | WAGES | 62 |
| Article 37: | ALCOHOL AND DRUG TESTING | 63 |
| Article 38: | TRANSITIONAL WORK EXPERIENCE | 66 |
| Article 39: | TERMINATION AND SAVINGS CLAUSE | 67 |
| Article 40: | OPERATOR-IN-TRAINING | 68 |
| APPENDIX A: | CLASSIFICATION, CLASSIFICATION SERIES, GRADE JOB TITLES AND HOURLY RATES | 69 |
| APPENDIX B: | RECOGNITION OF THE CURRENT AFSCME UNIT | 81 |
| APPENDIX C: | CITY OF PORTSMOUTH ATTENDANCE POLICY | 85 |

## ARTICLE 3:  MANAGEMENT RIGHTS

Section 1.    The City retains all rights not specifically modified by the terms and conditions of this Agreement including, but not limited to, the right to:

direct, supervise, hire, promote, suspend, discipline, discharge, transfer, assign, schedule and retain employees, relieve employees from duties and to determine the number of personnel needed in any agency or department, or to perform any function, determine services to be rendered, operations to be performed, utilization of technology, and overall budgetary matters to purchase equipment, materials or services; determine the appropriate job classifications and personnel by which government operations are to be conducted; determine the overall mission of the union of government, maintain and improve the efficiency and effectiveness of the government operations make reasonable rules to regulate the work force take any necessary actions to carry out the mission of the agency in situations of emergency and take whatever other actions may be necessary to carry out the wishes of the public not otherwise specified above or by collective bargaining agreement.

## ARTICLE 10:    GRIEVANCE PROCEDURE

Section 1    A grievance is defined as an allegation that the terms of this Agreement have been violated.

### Step 1

An employee who has a grievance shall reduce it to writing, setting forth the details of the grievance (i.e., the facts upon which it is based, the approximate time of their occurrence, the relief or remedy requested), and submit it to his Department Head (or his excluded Management supervisor), accompanied by a Union representative, within ten (10) calendar days after the event which is the cause of the grievance or within ten (10) calendar days after the grievant has knowledge, or with reasonable diligence should have had knowledge, of the event which is the cause of the grievance. The grievant and the Union representative shall meet when the grievance is filed and all parties shall disclose all facts available to them.

The Department Head (or his excluded Management supervisor) shall meet with the aggrieved parties and the Union representative and shall give his answer in writing to the employee and to the Union representative within ten (10) calendar days after the grievance was presented to him.

### Step 2

If the employee's grievance is not satisfactorily settled in Step 1, the aggrieved party or his representative may within seven (7) calendar days after a receipt of the Step 1 answer, appeal in writing to the Mayor or his designated representative.

The Mayor or his designated representative shall meet with the Union representative and the grievant within ten (10) calendar days of receipt of the grievance. The time for a written response shall be ten (10) calendar days after the meeting.

If the response of the Mayor is unsatisfactory, the Union may appeal the grievance within ten (10) calendar days to Step 3-Mediation or within thirty (30) calendar days to Step 4-Arbitration as stipulated in Step 4.

Step 3    Mediation

1    The selection procedure for the Mediator shall be in accordance with the procedure outlined in Step 4 of this Agreement, or from assignment of a Federation Mediation and Conciliation Service (FMCS) Mediator.

2.    The conduct of the Step Three Mediation hearing shall be in accordance with Step 4: Arbitration and the list below.

3.    The Mediator shall make his decision in conformity with this Agreement and shall not modify or change this Agreement and shall render a decision in writing or in accordance with FMCS rules within three (3) working days from the close of the hearing.  The acceptance or rejection of the Mediator's decision is voluntary for both parties.

Accordingly, under step three of the grievance procedure, the parties shall use the mediation approach and procedure for resolving grievances of a non-precedent nature or a suspension of four (4) days or less.

A.    When either party chooses the Step 3 alternative, the parties and the designated mediator (arbitrator) will select a mutually agreeable date for holding the mediation.  If a mutually agreeable date cannot be selected, the Mediator will select the date and both parties will abide by this selection.  This same procedure shall apply to selecting a time and location for holding the mediation.

B.    The Mediation hearing will be conducted in accordance with the following:

1.    The hearing shall be informal.  No hearing shall last longer than eight (8) hours in a twenty-four (24) hour period.

2.    No briefs shall be filed or transcripts made.  The mediator will set break and meal periods and time limits,

3    There shall be no formal rules of evidence.

4.    Each party's case must be presented by a representative of their own choice

5. The mediator (arbitrator) shall attempt to mediate the grievance after the facts presented by both parties.

6. If the parties cannot agree on any resolution, the mediator (arbitrator) will file his recommendations with the parties as to the grievance in question.

    a. The Mediator has three (3) days (seventy-two hours) to file his decision after the conclusion of the hearing (excluding Saturdays, Sundays or holidays).

    b. The Mediator's recommendations shall be based on facts developed by the parties that were submitted at the hearing.

    c. The Mediator's recommendations should not exceed two (2) typed pages.

    d. The authority of the Mediator shall be the same as outlined in the grievance procedure for an arbitrator.

    e. The Mediator shall file the recommendations with both parties.

C. Any recommendations of the Mediator in this procedure shall not be used as a precedent in any other grievance or hearing, except the grievance for which the Mediator has issued his recommendations.

D. The parties may agree to present more than one grievance to the Mediator for his recommendations. Each party will submit to the Mediator a copy of the grievance and any information that has been submitted as part of the grievance record prior to the hearing. The Mediator will be provided a copy of the collective bargaining agreement.

E. The parties will split the cost of the Mediator and hearing room. All other costs will be borne by the party incurring the costs.

Step 4

If the grievance is not satisfactorily resolved as provided in Step 2 or 3, the Union may appeal the grievance to arbitration. The demand for arbitration shall be submitted in writing within thirty (30) calendar days after receipt of the Step 2

written response, and the Union and the City will jointly, request a panel of arbitrators from the Federal Mediation and Conciliation Service (FMCS) to be submitted to both parties. The cost of the FMCS list shall be split equally by the parties. The parties shall strike names within ten (10) calendar days of receipt of the FMCS list. The alternate strike method shall be used to select an arbitrator. The party striking first shall be alternated on each successive list. The party striking second shall notify FMCS of the selection and copy the other party. If a party cancels the arbitration, it shall be responsible for any cancellation costs.

The arbitrator shall have no power to add to or subtract from or in any way modify any provisions of this Agreement.

The decision of the arbitrator shall be rendered within thirty (30) calendar days after the close of the hearing and the decision shall be final and binding upon the grievant, the Union and the City.

The fees and expenses of the arbitrator shall be borne equally by the parties. Each party shall bear the cost of its own representative presenting the case.

Either party may have a transcribed record made of the arbitration proceedings at its own expense providing it makes copies available without charge to the other party and the arbitrator.

Section 2:    The time limits set forth in the grievance procedure shall, unless extended by the City and the Union, be followed. If in the event the City does not provide timely answers a progression will occur whereby the next following step will automatically occur if the Step prior has not been fulfilled by the City. Ultimately, if the City does not respond, arbitration is automatic, if the grievance is otherwise timely. If the grievant or the Union fails to timely appeal a grievance, the grievance stands resolved on the basis of the management answer in the prior step. A grievance may be withdrawn at any time without creating a precedent.

Section 3:    The Union may file on behalf of its members through one of the officers a class action grievance at Step 1, which may affect a group of employees or other conditions as, set forth under this contract.

Section 4:    With the exception of serious safety violation grievances and grievances filed under Article 11 Section 6, all grievances will be filed at Step 1.

## ARTICLE 11:    DISCIPLINE

Section 1:    In all cases of disciplinary action, the employee shall be entitled to a hearing conducted by the Department Head or excluded Management supervisor recommending the disciplinary action. At this hearing the employee may be represented by the Union President or Union Steward, and/or an Ohio Council 8 Union Representative.

Section 2:    The City shall have the right to discipline or discharge an employee for just cause.

Section 3:    All actions of record including oral reprimands, written reprimands, suspensions, or dismissal will be maintained in each bargaining unit member's official personnel file. Any records of written reprimands will be removed from the official file upon the request of the member eighteen (18) months after such was given if no further corrective action has occurred; any documentation of oral reprimands will be removed from the official file upon request of the member one (1) year after such if no further corrective action has occurred. In any case in which the oral reprimand, was given written reprimand, suspension, or dismissal is disaffirmed through the Grievance Procedure, or by the Mayor, or any court of competent Jurisdiction, it shall be removed by the City. In addition, unsubstantiated or unproven allegations or complaints of misconduct made against a member shall not appear in the official files of the City and shall not be considered in future corrective action or promotional consideration. An employee shall have the right to receive one copy of anything placed in his official file. After the first copy the employee may request additional copies at the cost of twenty-five cents ($0.25) per page.

Section 4:    Written departmental reprimands may be issued by the department head without the necessity of a hearing, however, such reprimands shall be subject to the grievance procedure.

Section 5:    Any unauthorized absence from work or the assigned work location shall be considered grounds for disciplinary action. In addition, any unauthorized absence from work for a period of three (3) or more days shall be deemed a resignation.

Section 6.    Disciplinary grievances Involving suspensions will be filed directly at Step 2 of the grievance procedure, in writing, within ten (10) working days after the disciplinary action is issued.

Section 7.    Probationary removals of newly hired employees are not appealable through the grievance procedure nor does the City have to state any reason for removal. The City will notify the Union of any removals involving bargaining unit positions.

Section 8:    Any employee who has been disciplined by suspension or discharge will be given a written statement describing the reasons for which he has been suspended or discharged. In the case of suspension, he will be advised of the duration of the suspension. The affected employee shall be informed of his right to Union representation.

Section 9:    Suspensions will be removed from an employee's personnel file three (3) years following the date of suspension providing there is no intervening written notice of disciplinary action during the three (3) year period.

Section 10:    In imposing discipline on a current charge, the City shall not take into account any written reprimands or suspensions which should have been removed by the procedure of 3 and 4 herein, or any other discipline which occurred more than three (3) years previously.

Section 11:    An employee shall be given a copy of any written warning, reprimand, or other disciplinary action entered on his personnel record. A Union representative may be present at the bargaining unit member's request when discipline is given, The Local Union President shall receive a copy of any suspension or discharge notice.

Section 12:    Bargaining unit members shall be subject to discipline for using E-Mail to send personal messages or to transact personal business. Any unauthorized charges incurred by a bargaining unit member using the Internet or any other similar communication vehicles, long distances charges or carriers will result in discipline, as well as require repayment of costs incurred in the unauthorized use.

## ARTICLE 13:    SENIORITY

Section 1:    Seniority shall be defined as the length of continuous permanent service from the employee's most recent date of hire, most recent date of entry into the department, or most recent date of entry into the classification, whichever may apply, however, when an employee is laid off and subsequently recalled his seniority shall be determined from his most recent date of hire.

Seniority shall not be available to employees during their **probationary period,** but shall be retroactive to the date of hire upon successful completion of the probationary period. Permanent part-time employees shall accrue seniority based on a pro-rated basis. Unit of measurement shall be days with eight (8) hours being one (1) day and with two hundred sixty (260) days being one year.

A. As of May 1, 1994, bargaining unit seniority shall be defined as the bargaining unit member's uninterrupted total City Service.

B. After May 1, 1994, all newly hired employees in the bargaining unit shall have only their time in the bargaining unit jobs or positions calculated for their seniority.

Section 2:    Seniority shall be **lost** when an employee:

A. resigns;

B. is discharged for just cause;

C. is laid off and not recalled for the length of his seniority from the effective date of the layoff;

D. is off the payroll for any reason (except layoff, approved leaves of absence, military service or job-related illness or injury), for one (1) calendar year.

Section 3:    Four types of seniority are established under this Agreement, as follows

A. Bargaining Unit Seniority, which is defined as the length of time that an employee has been continuously employed by the City from the most recent date of employment.

B. Classification Seniority, which is defined as the length of time that an employee has been employed in the job classification in which he is then employed, from his last date of entry into that classification. O.I.T. Seniority shall be credited to the employee upon the employee becoming a licensed operator.

C. Departmental Seniority, which is defined as the length of time that an employee has been employed in the department in which he is then employed, from his last date of entry into that department.

D. Divisional Seniority, which is defined as the length of time that an employee has been employed in the division in which he is then employed, from his last date of entry into that division.

Section 4:    The City shall provide Local 1039 with two (2) copies of a seniority list and post in each work place within fourteen (14) calendar days after the effective date of this Agreement and every three (3) months thereafter, showing the seniority of each employee in the bargaining unit by classification, department and city-wide. Any employee shall have ten (10) working days after the list is prepared and posted in the department (or after knowledge of the list) to protest his position on that list. If no challenge is received, the list shall be deemed accurate for the remainder of the posting period.

In the event two (2) or more employees have the same starting date, the oldest employee shall have greater seniority.

Section 5:    Vacation Selection, Day Off Selection, Vacations shall be selected within the Division according to bargaining unit seniority. Employees having greater bargaining unit seniority shall have the first choice of available consecutive vacation dates. Once an employee has selected his vacation according to seniority he shall not have a further vacation selection until all employees have made a vacation selection.

In the event two (2) or more employees request the same day off, the employee with greater bargaining unit seniority shall be given first consideration.

Section 6:    Shift Selection

A.    Shift selection shall be based upon departmental seniority in the classification. Employees having greater departmental seniority in the classification shall have the first choice of shift assignments.

B.    New employees in any classification may be assigned to a shift for the purpose of training for a period not to exceed thirty (30) working days or the otherwise specified term of the training, whichever is the greater period of time. Following the employee's successful completion of the training, he shall be assigned to a shift according to his seniority in the new classification.

## ARTICLE 26:    CIVIL SERVICE RIGHT WAIVER

WHEREAS, provisions of this Collective Bargaining Agreement, as provided for under Section 4117. 10 R.C., and as mutually agreed to by the City and the Union, set forth the terms and conditions of bargaining unit employees employment and the right to appeal through the grievance procedures, the Union hereby waives, on behalf of all bargaining unit employees, the right of each and every such employee to pursue appeals to the Portsmouth Civil Service Commission regarding matters formally within the Jurisdiction of said Commission, and which are not covered by the terms and conditions of this Agreement.

Signed this _4th_ day of _August_ , 2000.

FOR THE UNION:                                    FOR THE CITY OF PORTSMOUTH, OHIO:

Sandra Shonborn, AFSCME                           Greg Bauer, Mayor of Portsmouth
Ohio Council 8 Representative


Patricia Williams, Negotiating Team               Robert W. Cross, Employer Representative
Member

Roy Payton, Negotiating Team Member               Lyn Risby


                                                  Juanita Jewett


                                                  Mike Blackburn


                                                  Sam Sutherland

89

FOR THE COUNCIL:

_____

Jim Kalb, City Council

_____

Ray Pyles, City Council

_____

Ann Sydnor, City Council

_____

Martin Mohr, City Council

_____

Carol Caudill, City Council

_____

Howard Baughman, Jr., City Council



**EXHIBIT**

**5**

### CITY OF PORTSMOUTH
### JOB DESCRIPTION

CLASSIFICATION SERIES:  EQUIPMENT OPERATOR
JOB TITLE:  HEAVY EQUIPMENT OPERATOR
Revised:  25 March, 1996

## GENERAL STATEMENT OF DUTIES

Is responsible for the operation of a variety of heavy motorized equipment under general supervision.  This sometimes involves difficult and sensitive problems in operation, with great consequence of error.  Is also responsible to perform the duties of a Light Equipment Operator, Utility Person or Common Laborer if the situation dictates.  May, in some situations, exercise supervision over lower classified employees. Performs other related duties as required.

## ILLUSTRATIVE EXAMPLE OF WORK

Operates snow plow and heavy graders to drag berms; shapes subgrades, base courses, and asphalt courses to engineer grade stakes; operates dozers to move fill material to desired areas; moves rocks and dirt; levels brush and small trees; operates heavy 4 wheel drive front end construction loaders for such tasks as excavating broken asphalt and concrete while preparing streets for resurfacing;  operates various street sweeping machinery; operates garbage packers and dumpster trucks in the Sanitation Division; operates a 10-wheel semi-trailer tractor/truck.  Performs operator level maintenance and emergency repairs on equipment used.  Assists' in erection of flood gates and other flood protection activities when required.  Assists' in ice and snow removal operations when required.

## DESIRABLE KNOWLEDGE, SKILLS AND ABILITIES

Ability to comply with written and oral instructions and to maintain cooperative working relationships with supervisors and peers. Initiative, dependability and the ability to relate to the public in a positive manner.  Ability to write and speak effectively; knowledge of mechanical operation of gasoline or diesel powered construction/maintenance equipment, and considerable skill in the operation of such equipment; knowledge of the safety considerations and potential problems associated with using various machinery.

## DESIRABLE EXPERIENCE AND TRAINING UPON APPLICATION

One year of experience in the operation of heavy-duty gasoline and diesel powered construction/maintenance equipment.  Incumbent must possess a valid State of Ohio Commercial Drivers License (CDL).  This position requires educational qualifications of at least High School graduation or equivalent.  Any combination of education, experience and training which provides the required knowledge, skills and abilities listed above.

## OTHER DUTIES AS ASSIGNED

The class specification which appears above is intended to be sufficient merely to identify the class and illustrative of the kinds of duties that may be assigned to positions allocated to the class and should not be interpreted to describe all of the duties, performance of which may be required of employees holding a position assigned to this class.

## PHYSICAL DEMANDS

The physical demands described here are representative of those that must
be met by an employee to successfully perform the duties of this job.
Reasonable accommodations may be made to enable individuals with
disabilities to perform the duties of this job.  While performing the
duties of this job the employee is very frequently required to talk or
hear; use hands to finger, handle or feel; reach with hands and arms and
taste or smell.  The employee is frequently required to stand and walk
and occasionally required to sit; climb or balance and stoop, kneel,
crouch or crawl.  The employee must very frequently lift and/or move up
to 50 pounds, frequently lift and/or move up to 100 pounds and
occasionally lift and/or move more than 100 pounds.  Specific vision
abilities required by this job include close vision; distance vision;
color vision; peripheral vision; depth perception and the ability to
adjust focus.

## WORK ENVIRONMENT

The work environment characteristics described here are representative of
those an employee encounters while performing the duties of this job.
Reasonable accommodations may be made to enable individuals with
disabilities to perform the duties of this job.  While performing the
duties of this job the employee is very frequently required to work near
moving mechanical parts; work in outdoor weather conditions and work near
vibration.  The employee frequently works in wet, humid conditions (non-
weather); works near fumes or airborne particles; works near toxic or
caustic chemicals; works in extreme cold (non-weather) and in extreme
heat (non-weather).  The employee occasionally works in high, precarious
places and runs the risk of electrical shock.  The noise level in the
work environment is usually loud or very loud.